UNITED STATES of America, Appellee,

v.

Jerald ANNESE, Defendant–Appellant.

UNITED STATES of America, Appellee,

v.

Nicholas TAVANO, Defendant–Appellant.

Nos. 79–1539, 79–1540.

United States Court of Appeals,
First Circuit.

Argued May 9, 1980.

Decided Sept. 22, 1980.

Richard J. Vita, Boston, Mass., for appellant Nicholas Tavano.

Sarah B. Criscitelli, Atty., Dept. of Justice, Washington, D.C., with whom Edward F. Harrington, U.S. Atty., and Martin D. Boudreau, Sp. Atty., Dept. of Justice, Boston, Mass., were on brief for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, DAVIS,* Judge, U.S. Court of Claims.

* Sitting by designation.

1. Methamphetamine is classified as a controlled substance. It is in the form of white

BOWNES, Circuit Judge.

Jerald Annese and Nicholas Tavano, defendants–appellants, appeal a jury conviction of manufacturing methamphetamine [1] in violation of 21 U.S.C. § 841(a)(1), and conspiring to commit that offense in violation of 21 U.S.C. § 846. Another defendant, Howard Sorofman, was acquitted on both counts.

There are three issues to be considered on appeal: (1) refusal of the district court to suppress evidence; (2) the exclusion of certain testimony; and (3) the district court's ruling and jury instruction on entrapment.

### The Suppression Issue

The evidence was that defendants had rented the house of codefendant Sorofman for the weekend. The premises were under surveillance on Saturday and Sunday by D.E.A. agents. On Sunday morning, the agents observed Annese and Tavano dismantling and removing equipment that could be used for the manufacture of methamphetamine. They were arrested as they attempted to drive off with the equipment. Sorofman and his girl friend had returned to the house on Sunday prior to the arrest of defendants. Immediately after the arrest, D.E.A. agents went to the house, knocked on the door, identified themselves and told Sorofman they were there to secure the premises until a search warrant arrived. There was testimony by Agent Ritucci that Sorofman invited the agents inside. Although this was contradicted by Sorofman, it was a sound footing for the district court's finding that the agents were lawfully on the premises. The court also had a firm evidentiary basis for finding that probable cause for issuance of the warrant was independent of the agents' entry into the house. The court, as fact finder, was free to reject Sorofman's uncontroverted testimony that, pending the arrival of the search warrant, the agents roamed through the house, searched a closet and

crystals or crystalline powder. It is a central nervous system stimulant. Dorland's Illustrated Medical Dictionary (25th ed. 1974).

removed items from the house. "We see nothing that would upset the trial court's credibility finding." *United States v. DiGregorio*, 605 F.2d 1184, 1188 (1st Cir. 1979), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 179, 44 U.S. 983, 100 S.Ct. 489, 62 L.Ed.2d 411 (1980). We evaluate the district court's findings to determine if they were clearly erroneous. *United States v. Romano*, 583 F.2d 1, 7 (1st Cir. 1978); *United States v. Christian*, 571 F.2d 64, 66 (1st Cir. 1978).

Moreover, there is, as the district court indicated, a serious question as to whether appellants have standing to contest the search and seizure. They had vacated the premises before the search was made and the person who lived in the house had returned and was occupying the premises at the time of the search. *See United States v. Salvucci*, —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

*The Exclusion of Testimony*

█ A synopsis of the pertinent evidence is necessary to understand this issue. The chief government witness was a drug dealer–informant, Thomas Busciglio, who lived in Virginia Beach, Virginia. Busciglio testified in détail as to his meetings and dealings with defendants. After the arrangements were made by his business associate Kathy Stokes, Busciglio and she came to Boston in October of 1978 to purchase methamphetamine. They were met by a man named Freedman who took them to the premises of the Hub Tool and Dié Company which was owned and operated by Tavano. Busciglio remained in the car while Stokes and Freedman went into the building. After testing a sample brought to him by Stokes, Busciglio authorized the purchase of a quantity of methamphetamine. Busciglio did not meet the defendants at this time, but saw them come out of the building with the sample.

Busciglio and Stokes returned to Boston in early November to purchase more methamphetamine. This time he was introduced to defendants by Stokes. The defendants, Stokes, and Busciglio went to Tavano's house where the process of making methamphetamine was discussed. At that time, Busciglio was told by defendants that it was difficult for them to obtain P2P and if he could obtain some, they would work out a deal. P2P, which is the most important precursor ingredient, is mixed with phenyl acetone, mono–methylamine and aluminum to make methamphetamine. After Busciglio returned to Virginia, he bought six five–milligram bottles of P2P [2] which he brought with him when he and Stokes returned to Boston in late November of 1978. This was turned over to the defendants on the understanding that there would be a fifty–fifty split of the methamphetamine made from it.

In February of 1979, Busciglio was contacted by a D.E.A. agent who had learned of his prior purchase of P2P. After some preliminary sparring, Busciglio agreed to cooperate with the D.E.A. He returned to Boston on March 6, 1979, apparently without Stokes, and met with D.E.A. agents at their office. At that time, a box containing P2P, furnished by the D.E.A., was given to him. Unknown to Busciglio, a beeper which transmitted radio signals was concealed in the box. Busciglio then went to his motel room accompanied by D.E.A. Agent Burrows and called Tavano. Arrangements to meet defendants were made so that the P2P could be delivered to them. Eventually, the P2P was placed in Tavano's vehicle. The D.E.A. agents kept Busciglio under surveillance until the box of P2P was transferred to Tavano's automobile. Thereafter, the defendants were kept under surveillance through the radio signal transmitted by the beeper.

The chief defense of both defendants was entrapment. Annese took the stand and testified in effect that neither he nor Tavano knew how to manufacture methamphetamine and that it was Busciglio who supplied the formula for making it. Annese

---

**2.** P2P is not a controlled substance, but manufacturers and suppliers are required to list the names and addresses of purchasers.

claimed that neither he nor Tavano had made any methamphetamine until March of 1979, and that they did so at the instigation of Busciglio and with the P2P supplied them by him. As already indicated, Busciglio's testimony was that Annese and Tavano were already in the business of manufacturing methamphetamine and all he did was supply the P2P.

Defendant Tavano called Stokes as a witness to contradict Busciglio's testimony that it was defendants, not he, who were engaged in the manufacture of methamphetamine. Tavano hoped to prove through Stokes' testimony that Busciglio had entrapped him into making the methamphetamine which precipitated their arrest and indictment. Prior to Stokes taking the stand, the court appointed counsel to advise her of her rights. Her counsel informed the court that she would invoke her fifth amendment right against self–incrimination. A voir dire hearing was held at which Tavano's attorney asked a series of questions, which, if answered as hoped, would have tended to impeach Busciglio's testimony. Stokes refused to answer any questions on fifth amendment grounds. Tavano then asked to be allowed to call his codefendant Annese who had already testified. It was represented to the court that Annese would testify that Stokes had told him that Busciglio had told her that, in order to avoid prosecution for dealing in drugs, he had decided to "set up" the defendants for the "feds." Tavano also represented that Annese would testify to other statements by Stokes, as indicated by the voir dire questions, that impeached Busciglio's testimony. The court refused to allow Annese to testify. Tavano claims that the testimony should have been admitted as an exception to the hearsay rule under Fed.R.Evid. 804(b)(3) as a statement against penal interest.

We preface our analysis by rejecting the government's contention that this was a matter exclusively within the discretion of the trial court. This was not a question of determining the proper scope of cross–examination of a witness for purposes of attacking credibility as in the case relied upon by the government, *United States v. Nogueira*, 585 F.2d 23, 25 (1st Cir. 1978). The main defense here was entrapment. The key issue was the predisposition of the defendants. If the statement met the requirements of the rule, then it should have been admitted. Fed.R.Evid. 804(b)(3) excludes from the hearsay rule:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

In *United States v. Barrett*, 539 F.2d 244, 249–53 (1st Cir. 1976), we discussed the history and purpose of Fed.R.Evid. 804(b)(3). We concluded that "[a]s finally enacted, Rule 804(b)(3) requires a two–stage analysis: first, do the offered remarks come within the hearsay exception as a 'statement against interest'? and second, if they do, is there sufficient corroboration to clearly indicate trustworthiness?" *Id.* at 251. *See also United States v. Thomas*, 571 F.2d 285, 288 (5th Cir. 1978); *United States v. Benveniste*, 564 F.2d 335, 341 (9th Cir. 1977).

While it might be debatable whether the purported statements of Stokes, as indicated by the questions asked on voir dire, were *against her penal interest*,[3] we assume

---

**3.** The other questions were:

Isn't it a fact that you have known Thomas Busciglio for approximately four or five years and began dating him in October of '78 and for a period of four months thereafter en-

gaged in a relationship, a personal relationship, with him?

.    .    .    .    .

Well, have you ever seen or observed Thomas Busciglio give, deliver or sell narcotic

for purposes of our discussion that they were. We are unable, however, to find any "corroborating circumstances [that] clearly indicate the trustworthiness of the statement." Annese would, as far as the record shows, take the stand and testify as to what Stokes purportedly told him. In *Barrett*, we said, "there is no question but that Congress meant to preclude reception of exculpatory hearsay statements against penal interest unless accompanied by circumstances solidly indicating trustworthiness. This requirement goes beyond minimal corroboration." 539 F.2d at 253. In *United States v. Thomas*, 571 F.2d 285, the exculpatory statement was made in the presence of a United States magistrate who was called as a witness to testify as to what was said. Unlike those cases, there were no corroborating circumstances here at all. The bare testimony of a codefendant charged with the same crimes as the one calling him as a witness is utterly devoid of corroboration. Indeed, the whole scenario argues against trustworthiness. The district court was correct in invoking the hearsay rule and excluding the statements purportedly made by Stokes to Annese.

*The Entrapment Ruling and Instructions*

*The Ruling*

The court was informed during the course of the trial that Tavano was not going to take the stand, but would claim the entrapment defense. After due consideration, it ruled:

> Under the law of this circuit, the defendant may not claim entrapment if he does take the stand and denies commission of the offense–*United States against Caron*, 588 Fed. 2nd, 851 at 852, Note 4. I have not found any case in this circuit which squarely ruled on the issue of whether the defendant may refuse to take the stand and claim entrapment, but I now expressly rule that that is the law in this circuit.

drugs to other individuals in the Virginia Beach area?

We can understand why the court was misled by our footnote in *Caron*, but this ruling was error. The seminal case on entrapment is *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). In setting the parameters for its use, the Court said:

> What has been said indicates the answer to the contention of the Government that the defense of entrapment must be pleaded in bar to further proceedings under the indictment and cannot be raised under the plea of not guilty. This contention presupposes that the defense is available to the accused and relates only to the manner in which it shall be presented. The Government considers the defense as analogous to a plea of pardon or of *autrefois convict* or *autrefois acquit*. It is assumed that the accused is not denying his guilt but is setting up special facts in bar upon which he relies regardless of his guilt or innocence of the crime charged. This, as we have seen, is a misconception. The defense is available, not in the view that the accused though guilty may go free, but that the Government cannot be permitted to contend that he is guilty of a crime where the government officials are the instigators of his conduct. The federal courts in sustaining the defense in such circumstances have proceeded in the view that the defendant is not guilty. The practice of requiring a plea in bar has not obtained. Fundamentally, the question is whether the defense, if the facts bear it out, takes the case out of the purview of the statute because it cannot be supposed that the Congress intended that the letter of its enactment should be used to support such a gross perversion of its purpose.

287 U.S. at 452, 53 S.Ct. at 216.

Although there has been a shift in the Court's attitude towards entrapment in recent years, *see Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113

Isn't it a fact that Thomas Busciglio was associated with members of a motorcycle gang in the Virginia Beach area by the name of the Renegades?

(1976); *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), there has been no break with the position staked out in *Sorrells,* that the defense is not inconsistent with a plea of not guilty.

Now to the footnote which led the district court down the garden path:

> Under the law of this Circuit it is clear that the issue of entrapment does not arise until a defendant admits commission of the crime charged but asserts that the offense was instigated by the actions of the law–enforcement officers. *Sylvia v. U.S.,* 312 F.2d 145, 147 (C.A. 1, 1963); *Kadis v. U.S.,* 373 F.2d 370, 372–74 (C.A. 1, 1967); *U.S. v. Rodrigues,* 433 F.2d 760, 761 (C.A. 1, 1970); *U.S. v. Badia,* 490 F.2d 296, 299 (C.A. 1, 1973); *U.S. v. Russo,* 540 F.2d 1152, 1154 (C.A. 1, 1976); *Tzimopoulos v. U.S.,* 554 F.2d 1216, 1217 (C.A. 1, 1977).

*United States v. Caron,* 588 F.2d 851, 852 n.4 (1st Cir. 1978). In *Caron,* the defendant testified and the issue was whether he had admitted enough facts relating to the commission of the crime so that his testimony was consistent with the defense of entrapment.

The *Caron* footnote derives essentially from language we used in *Sylvia v. United States,* 312 F.2d 145, 147 (1st Cir.), *cert. denied,* 374 U.S. 809, 83 S.Ct. 1694, 10 L.Ed.2d 1032 (1963).

> This case falls under a settled principle that a defendant's *testimony* to the effect that he did not commit the crime cannot raise an issue of entrapment.

(emphasis added). The gist of *Sylvia* is that the law does not countenance the inconsistency of taking the stand to deny involvement in the predicate acts which constitute the offense while contemporaneously claiming entrapment by the government. This so–called "inconsistency theory" forces the defendant to make an election between admitting the deed and relying on the defense or denying the deed and waiving the defense. Perhaps the rationale used in *United States v. Rodrigues,* 433 F.2d 760, 761 (1st Cir. 1970), *cert. denied,* 401 U.S. 943, 91

S.Ct. 950, 28 L.Ed.2d 224 (1971), best summarizes the meaning of *Sylvia* and its progeny. "[O]ne cannot both deny the *deed* and say he was entrapped into doing it." (emphasis added). *Caron* and the cases cited therein are limited factually to the defendant who voluntarily takes the stand in his own defense. They do not address the issue of whether a defendant can remain silent and claim entrapment as a defense.

We adverted to this distinction between denying the commission of the particular acts which comprise the crime and not testifying at trial when we said in *Gorin v. United States,* 313 F.2d 641, 654 (1st Cir.), *cert. denied,* 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963):

> By the defense the accused may admit his crime, as Glassman did on cross–examination when he admitted that he gave McCaffrey $10,000 "as a bribe," or he may rely upon his right to require the government to prove the case against him beyond a reasonable doubt, and in either event ask to be relieved of its consequences because of the unsavory tactics of representatives of the government. Stated another way, the defense of entrapment is not interjected to establish the absence of an essential element of the crime but to present facts collateral or incidental to the criminal act to justify acquittal on the ground of an overriding public policy to deter instigation of crime by enforcement officers in order to get a conviction. Since by the defense the accused is asking to be relieved of the consequence of his guilt, if found or admitted, by objecting to the tactics of the representatives of the government, we think that one who raises the defense should be required not only to come forward with evidence but should also be required to establish inducement by a preponderance of the evidence. (footnotes omitted).

In a footnote, we explored the question whether silence is inconsistent with an entrapment defense and found that it is not: [4]

---

**4.** This appears to be the rule followed by those circuits that have discussed the question. *See,*

*e. g., United States v. Demma,* 523 F.2d 981, 984–85 (9th Cir. 1975) ("inconsistency theory"

It is inconsistent for an accused to take the stand and deny the commission of the crime charged and then assert his right to a charge on the defense of entrapment. *See Sylvia v. United States*, 1 Cir., 312 F.2d 145. However, where there is evidence of governmental inducement, it is not fatally inconsistent for an accused to keep silent in the hope that the jury will not find that the government has proved its case beyond a reasonable doubt, but ask that the jury be charged on the defense of entrapment if it should find the commission of the allegedly criminal acts. The law allows this much inconsistency. *See Henderson v. United States*, 237 F.2d 169, 172–173 (C.A. 5, 1956).

*Id.* at 654 n.10.

■ Because the mechanics of asserting an entrapment defense evoked considerable confusion, we formulated a rule designed to simplify the matter in *Kadis v. United States*, 373 F.2d 370 (1st Cir. 1967).

Henceforth we will look, singly, at the ultimate question of entrapment. If the defendant shows, through government witnesses or otherwise, some indication that a government agent corrupted him, the burden of disproving entrapment will be on the government; but such a showing is not made simply by evidence of a solicitation. There must be some evidence tending to show unreadiness.

373 F.2d at 374. The quantum of evidence that is required before the burden of per- suasion shifts to the government must be more than a mere scintilla. *Id. See also Tzimpoulos v. United States*, 554 F.2d 1216 (1st Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977).

■ While the success of a defendant in convincing a jury that he was entrapped may be reduced by his failure to testify, that is a choice that he has a right to make free of any compulsion whatsoever.[5] To hold otherwise would raise a serious fifth amendment question. Pursuant to the court's erroneous ruling, Tavano abandoned his previous trial strategy and took the stand. He testified at length, admitted a prior conviction, and was vigorously cross-examined. Under the circumstances, we are unable to say that the erroneous ruling occasioned no prejudice and was harmless.

### The Instruction

Defendants requested that the court instruct the jury that Thomas Busciglio was an agent of the government. This request was denied and the court instructed the jury as follows:

You will notice all through this charge on entrapment I have referred to the defendants as being otherwise innocent and persons lured by the agents of the government to commit the crime. The defendants' theory of entrapment is based on the contention Busciglio was an agent of the government when he allegedly induced them to participate in the

not applicable where defendant does not take stand because defendant has not denied the crime); *United States v. Groessel*, 440 F.2d 602, 605 (5th Cir.), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971) (because defendant chose not to testify, there was no inconsistency between his posture and the entrapment defense. "[A] plea of not guilty is not repugnant to the defense of entrapment."); *Rodriguez v. United States*, 227 F.2d 912, 914 (5th Cir. 1955) ("It is true that [entrapment] may be raised even though the defendant pleads not guilty, but, 'it assumes that the act charged was committed' "). *See also United States v. Burkley*, 591 F.2d 903 (D.C.Cir.1978) *cert. denied*, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979) (entrapment instructions withstand appellate scrutiny; defendant did not testify in own behalf); *accord, Demos v. United*

*States*, 205 F.2d 596, 598–99 (5th Cir.), *cert. denied*, 346 U.S. 873, 74 S.Ct. 123, 98 L.Ed. 382 (1953).

5. The cases cited by the government make this clear. In *United States v. Sheldon*, 544 F.2d 213, 220–21 (5th Cir. 1976), the court faulted the instruction because it amounted to a partially directed verdict for the government on the issue of agency and inducement. In *Orser v. United States*, 362 F.2d 580, 584–85 (5th Cir. 1966), the question was the admissibility of testimony, not an instruction to the jury. The court noted that defendant did not request that the question of whether he was present at and understood a certain conversation be submitted to the jury. The court, therefore, found that defendant conceded this.

crimes. If you find that Busciglio was acting as an agent for the government during this time, you must then consider the charge of entrapment in evaluating the case.

On the other hand, if you find Busciglio was not a government agent at the time he allegedly induced them, you are not required to consider entrapment, since there was no evidence of any entrapment by anyone other than by Busciglio, and entrapment has to be done either by a government agent or someone working for a government agent. So if you find Busciglio was not acting in his relations with these defendants as an agent of the government or a government DEA agent, then you may pass by the question of entrapment.

The problem with this instruction is that it created a question of fact that did not exist. The evidence established government agency beyond a doubt. Busciglio agreed in February of 1979 to cooperate with the D.E.A. after he was approached by Agent Burrows in Virginia Beach. Busciglio received $500 from Burrows to finance his trip to Boston in March. He also received an additional $500 from the D.E.A. Although the testimony on this is not clear, it would appear that in addition to monetary payments totalling $1,000, the D.E.A. also furnished Busciglio with a round trip plane ticket from Virginia Beach to Boston. Busciglio was in constant contact with the D.E.A. agents during his stay in Boston in March and kept them informed of all his activities. It was the D.E.A. that furnished the P2P which was delivered to defendants and resulted in their surveillance, arrest, and indictment.

The government did not argue that Busciglio was not an agent of the D.E.A. in March of 1979. Its argument focused, quite correctly, on the predisposition of defendants.

The government argues before us that "all factual questions, even where undisputed, are ordinarily left to the determination of the jury." Brief at 24. This puts the shoe on the wrong foot. A court should normally not take from the determination of the jury undisputed facts necessary to prove the guilt of a defendant. If the government's reasoning were accepted, then the trial court could never grant a motion for judgment of acquittal based on the insufficiency of the evidence and appellate courts would not have to review records in criminal trials to determine if the evidence warranted the conviction.

Moreover, the question of agency is one for the court where the underlying facts are not in dispute. We think that where, as here, the government does not claim that its witness–informant was not a government agent at the time that the predicate crime was committed and the facts are clear and uncontroverted the trial court should instruct the jury that the witness was a government agent. The only case that we have been able to find directly bearing on this question suggests that such an instruction should be given in these circumstances.

> Although the court did not expressly instruct that the paid informant, White, is to be regarded as an agent of the government, we think the jury must have understood this in view of all of the evidence which was introduced bearing upon the relationship between White and the government. Had Nordeste or his counsel had a different view at the time of the trial they would undoubtedly have asked for such an instruction.

*Nordeste v. United States*, 393 F.2d 335, 339 (9th Cir.), *cert. denied*, 393 U.S. 878, 89 S.Ct. 178, 21 L.Ed.2d 151 (1968).

Up until the part on agency, the instruction on the law of entrapment was clear, accurate and complete. If no instruction as to Busciglio's role had been given, we would be tempted to find harmless error, especially since the court had instructed the jury in another part of the charge that Busciglio was a government informant. The agency instruction, however, gave rise to an unnecessary risk of jury confusion by injecting into the case a nonexistent factual issue that was directly contrary to the evidence and which, if improperly decided against

the defendants, would obviously have done lasting harm to them. This amounted to a finding by the court that there was a dispute as to whether or not Busciglio was an agent which, as we have pointed out, was not so. Indeed, our reading of the record leads us to conclude that the government tacitly conceded that its chief witness was a government agent in March of 1979. The instruction, therefore, was not harmless error.

*Reversed and remanded for new trial.*