UNITED STATES of America,

v.

Ernesto J. BENEVENTO, Ernest A. Benevento, a/k/a "Anthony Nuccio," Guido Rendel, a/k/a "Paul Hanson," Earl Admiral Keller, and Carmine Loiacono, Defendants.

No. SSS 86 Cr. 485 (EW).

United States District Court,
S.D. New York.

Dec. 17, 1986.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City (Peter M. Lieb and John K. Carroll, Asst. U.S. Attys., of counsel), for U.S.

Goldberger & Dubin, P.C., New York City (Lawrence A. Dubin and Paul A. Goldberger, of counsel), for defendants Ernesto J. Benevento and Earl Admiral Keller.

Entin, Schwartz, Barbakoff & Schwartz, North Miami Beach, Fla. (Alvin Entin and Frederick Schwartz, of counsel), for Ernest A. Benevento.

Fischetti & Pomerantz, New York City (Mark F. Pomerantz, of counsel), for defendant Carmine Loiacono.

EDWARD WEINFELD, District Judge.

Five defendants are named in an indictment charging conspiracy and substantive violations of the RICO statute, 18 U.S.C. § 1962(a), centering primarily about the importation, manufacture, distribution, and possession with intent to distribute heroin in violation of the Drug Control Act, 21 U.S.C. § 812, et. seq. Three codefendants join in motions pursuant to Fed.R.Crim. 12(b) and 41 for an order to suppress all evidence obtained as a result of:

1. a warrantless search of the luggage and persons of defendants Ernesto J. Benevento and Ernest A. Benevento at Kennedy Airport, Long Island, New York;

2. warrant searches of the respective residences of Ernesto J. Benevento and Ernest A. Benevento, located in West Palm Beach, Florida;

3. a warrant search of a home owned by Ernest A. Benevento in Chandler, Arizona; and

4. a warrantless search of the person and automobile of defendant Earl Admiral Keller in the vicinity of Tucumcari, New Mexico.

We consider each motion separately.

The Search at Kennedy Airport

Ernesto J. Benevento and Ernest A. Benevento move to suppress the fruits of the warrantless search of their persons and luggage that took place on June 3, 1985 at John F. Kennedy Airport. The search resulted in discovery of $952,000 in undeclared cash which was being transported out of the country in apparent violation of federal currency laws. The Beneventos maintain that there was no probable cause or reasonable suspicion to justify the search.

They first argue that border searches of persons *leaving* the United States should be held invalid unless conducted in accordance with the probable cause requirement of the Fourth Amendment. This contention is in direct conflict with the clear weight of authority of our Court of Appeals, which has explicitly held that the "border search" exception to the Fourth Amendment, established by the Supreme Court in *United States v. Ramsey,*[1] applies to persons *leaving* the United States as well as persons *entering* it.[2] Defendants have presented no reason to disturb this settled precedent.

Defendants next argue that the search was aimed at discovering unreported currency and that under 31 U.S.C. § 5317(b), currency searches may be conducted only if there is "reasonable cause" to believe that evidence of a currency violation will be found. Claiming the government had no such reasonable cause, the Beneventos urge the exclusion of the fruits of the search to deter future violations of § 5317(b). The government does not dispute that the search was a currency search, but maintains, first, that there was "reasonable cause" to conduct the search and second, that even if not and § 5317(b) was violated, the evidence obtained as a result should not be excluded since no exclusionary remedy is provided for in the federal statute.

Defendants, in support of their motion, rely upon the majority opinion in *United States v. Chemaly,*[3] an Eleventh Circuit case in which a divided panel held exclusion appropriate for evidence seized in a border search that violated the precursor to § 5317(b). The majority reasoned that when Congress enacted 31 U.S.C. § 1105,

1. 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977).

2. *United States v. Ajlouny,* 629 F.2d 830, 833–34 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981); *United States v. Swarovski,* 592 F.2d 131, 133 (2d Cir.1979).

3. 741 F.2d 1346, 1358 (11th Cir.1984), *reinstated,* 764 F.2d 747 (1985) (en banc); *United States v. Turner,* 639 F.Supp. 982, 992 (E.D.N.Y.1986).

requiring a search warrant for currency searches at the border,

> [T]he universal understanding of the remedy for an illegal search without a warrant was exclusion of the evidence. If Congress did not specify exclusion as the remedy in 1970 when the legislation was passed, it necessarily was because the remedy was obvious.

In support of this proposition, the majority noted that exclusion is the general rule when the Fourth Amendment is violated and that in *Rea v. United States*,[4] and other Supreme Court cases, an exclusionary remedy had been applied to federal rules and statutes that did not explicitly so provide.

This Court declines to follow *Chemaly*, because there is no evidence in either the language or the legislative history ·of § 5317(b) to suggest that Congress, in enacting that provision in 1984, intended that an exclusionary remedy be applied to illegally seized evidence.[5] Defendant's argument can draw no support from the application of such a remedy in other situations. Because the Fourth Amendment does not apply to border searches, the fact that the exclusionary rule is the remedy for Fourth Amendment violations carries no force in this instance. Moreover, the cases applying an exclusionary remedy under other statutes and rules are distinguishable. In *Rea v. United States*, for example, the application of an exclusionary remedy for a violation of the Federal Rules of Criminal Procedure was based in part on the fact that those rules were originally prescribed by the Supreme Court, giving the Court special authority in their interpretation and enforcement. Finally, it is to be noted that Congress in its own enactments does not rely on silence to indicate an exclusionary rule is appropriate; in enacting the electronic surveillance statute,

for example, Congress made specific provisions for the exclusion of illegally obtained evidence. Having exercised its power explicitly in previous instances, had Congress wanted to exercise its authority in this instance, it knew how and would have expressed that purpose.[6]

Moreover, it must be remembered that *Chemaly* concerns the precursor to § 5317(b), a statute enacted in 1970 to require that border searches be conducted pursuant to warrants. *Chemaly*'s conclusions as to Congressional intent in 1970 are of doubtful relevance to the question of Congress's intent when it enacted § 5317(b) fourteen years later, particularly when the express purpose of the new statute was to reduce the barriers to conducting currency searches. As Judge Platt noted in *United States v. Turner*,[7] § 5317(b) eliminated the warrant requirement to give federal agents a freer hand in halting the efforts of drug traffickers to smuggle their earnings out of the country. Given the absence of any indication that Congress intended an exclusionary remedy, and given that such a remedy would weaken the manifest purpose of the statute, the Courts should not amend the statute by applying an exclusionary rule. The fruits of the airport search are thus admissible, and the motion to suppress is denied.

The Searches of the Florida Residences

■ On May 28, 1986, a magistrate of the Southern District of Florida issued warrants authorizing the search of the residence of Ernesto J. Benevento at 14780 Draft Horse Lane, West Palm Beach, Florida, and the residence of Ernest A. Benevento at 14832 Draft Horse Lane, also in West Palm Beach. The list of items to be searched for included:

> Monies, books, records, financial records, computer hardware and software, papers, photographs, documents, personal

---

**4.** 350 U.S. 214, 217–18, 76 S.Ct. 292, 294, 100 L.Ed. 233 (1956).

**5.** *See United States v. Chemaly*, 741 F.2d 1346, 1358 (11th Cir.1984), *reinstated*, 764 F.2d 747 (1985) (en banc); *United States v. Turner*, 639 F.Supp. 982, 992 (E.D.N.Y.1986).

**6.** *See* 18 U.S.C. § 2518(10)(a). Congress was also explicit about exclusion in 50 U.S.C. § 1806(e)-(g), concerning military wiretaps.

**7.** 639 F.Supp. 982, 992 (E.D.N.Y.1986).

address books, and other things which constitute evidence of the commission of are are [sic] designed or intended as a means of or are the contraband or the fruit of the violation of the federal narcotics laws, the federal currency laws, and the federal tax laws.

The affidavits submitted to the magistrate described in detail evidence to support the charge that the Beneventos were part of a vast and far-flung criminal enterprise which, prior to June 3, 1985, had imported into the United States heroin and heroin precursor products with a street value in excess of $225,000,000. Based on interviews with confidential informants, the affidavits described the importation of morphine base at West Palm Beach, and its transportation to Phoenix, Arizona, where it was converted into heroin and shipped to New York for distribution. The affidavits also described how, again prior to June 3, 1985, the Beneventos were involved in several attempts to smuggle hundreds of thousands of dollars out of the United States on international air flights. During the first half of 1985 alone, currency in excess of $1,500,000 was seized from the Beneventos and Fatima dos Santos Nobre, an alleged accomplice. A review of the Beneventos' tax returns and known real estate holdings was also submitted as evidence of their unexplained and unreported wealth.

The principal affiant as to these matters was Louis A. Pharao, a Drug Enforcement Agent with six years' experience in approximately 200 narcotics investigations, of which 150 involved the distribution of heroin. Agent Pharao stated that the Beneventos operated "at the highest levels of international narcotics trafficking" and that significant drug traffickers frequently maintain, among other things, large amounts of currency, records relating to drug transactions, and lists of names and telephone numbers of persons involved in such transactions. Because drug traffickers need ready access to these items and personal financial records are customarily kept at home, and because the Beneventos' homes were equipped with computers and computer pulse telephone lines that might prove useful in managing data concerning criminal transactions, Agent Pharao stated his belief that the Beneventos' residences contained evidence that would be probative of violations of federal narcotics, currency, and tax laws.

Under *United States v. Leon*,[8] even if probable cause for a search is in fact lacking, the exclusionary rule is not applied if officers act in reasonable reliance upon a facially sufficient warrant issued by a detached, neutral magistrate. Defendants, however, move to suppress under an exception to *Leon* established in *Franks v. Delaware*[9] and its progeny. Under *Frankss*, if a magistrate issues a warrant on the basis of affidavits containing falsehoods knowingly or recklessly made, the warrant is invalid. Subsequent cases have extended *Franks* to include material omissions.[10] Defendants thus argue that the warrants are invalid because of the government's failure to state in the affidavits that it had no evidence of criminal activity by the Beneventos after June 3, 1985. In particular, defendants note that although the government stated that wiretaps had been placed on the computer pulse lines, it omitted to state that the wiretaps had failed to pick up any evidence of criminal activity subsequent to June 3.

The government's affidavits, however, are not misleading. They clearly identified the dates of the Beneventos' suspected criminal activity as prior to June 3, 1985,

---

8. 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

9. 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

10. *United States v. Marin-Buitrago*, 734 F.2d 889 (2d Cir.1984); *United States v. Williams*, 737 F.2d 594 (7th Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Dennis*, 625 F.2d 782 (8th Cir. 1980); *United States v. Lefkowitz*, 618 F.2d 1313 (9th Cir.1980), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980); *United States v. Martin*, 615 F.2d 318 (5th Cir.1980); *United States v. Melvin*, 596 F.2d 492 (1st Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979).

and they made no claim that there was continuing criminal activity at the Beneventos' residences. The affidavits were devoted to demonstrating probable cause to believe that specified items related to past crimes were still at their homes. Given the weight due an agent's expert opinion concerning the likelihood evidence will be found,[11] Agent Pharao's belief that evidence of the Beneventos' personal wealth, records of illegal drug transactions, and evidence linking the Beneventos to their conspirators might still exist provided a reasonable basis for the magistrate to issue the warrant. The absence of a statement that there was no evidence of continuing criminal activity has no bearing on whether evidence of past crimes might still exist. Such information was not material and does not cast doubt on the existence of probable cause for the issuance of the warrants.[12]

In particular, the absence of any statement that wiretaps on the Benevento's computer pulse lines failed to pick up incriminating evidence after June 3, 1985 cannot be considered a material omission. While the omission of exculpatory evidence might well be material, an absence of incriminating evidence is not exculpatory—especially considering that the wiretaps were installed after the time when the alleged crimes were thought to have been committed. The fact that the Beneventos had such computer pulse lines supported the government's position that the Beneventos were sophisticated computer users who possessed the requisite skills and equipment to use computers in managing a criminal enterprise. This inference, in turn, made it all the more likely that incriminating records might be found at their homes. The government's affidavits are neither misleading, nor inadequate to support searches of the Beneventos' homes.

Defendants' motion to suppress is therefore denied.

### The Search of the Chandler, Arizona Residence

On May 28, 1986, a magistrate of the District of Arizona issued a warrant authorizing the search of 20615 South 124th Place in Chandler, Arizona. Defendant Ernest A. Benevento, joined by two co-defendants, challenges the issuance of the Arizona warrant on grounds similar to the challenges to the Florida warrant. Specifically, Benevento alleges that the affidavits in support of the warrant were misleading because they failed to mention the absence of any evidence of criminal activity after June 3, 1985 and that the allegations of past crimes were stale, and could not support a finding of probable cause.

■ Benevento's motion to suppress must in the first instance be dismissed on the ground that he lacks standing to challenge the search. Although he possessed record title to the property, the testimony of his two nephews before a grand jury indicates that he gave up permanent residence at that location no later than 1982 and gave up any possessory interest in the property when he last left it in the late fall of 1984. Six months subsequent to that time, his nephews moved in and assumed responsibility for payment of the mortgage as well as the cost of all utilities on the property. No evidence has been submitted to negate this testimony. Since mere ownership is insufficient to demonstrate standing to object to a search,[13] and since Benevento surrendered his interest in the property, it can readily be inferred that he relinquished any expectation of privacy with regard to the Chandler location.[14]

■ Moreover, even if Benevento had standing to challenge the search, his challenge would fail for two reasons. First, for the same reasons given in the discus-

---

**11.** *United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985).

**12.** *United States v. Marin-Buitrago,* 734 F.2d 889, 895 (2d Cir.1984).

**13.** *United States v. Salvucci,* 448 U.S. 83, 90–91, 100 S.Ct. 2547, 2552, 65 L.Ed.2d 619 (1980).

**14.** *See United States v. Annese,* 631 F.2d 1041, 1043 (1st Cir.1980); *United States v. Gilman,* 684 F.2d 616, 619 (9th Cir.1982).

sion of the Florida warrants, the affidavits in support of the Arizona warrant are not misleading. They were based solely on evidence of past activity at the site—here the operation of a heroin conversion laboratory—and did not depend on evidence of continuing criminal activity. Second, the argument concerning staleness is effectively rebutted by the affidavits' statement that traces of heroin can be found up to three years after its manufacture at a particular site. The motion to suppress is thus denied.

### The Search of Keller's Car

On June 5, 1984, defendant Earl Admiral Keller was stopped on Interstate 40 in New Mexico by a policeman who clocked him with radar traveling at 57 m.p.h. in a 55 m.p.h. zone. The officer, upon approaching Keller's car, smelled a "sweet" odor coming from the car which he was "sure" was cocaine. While the officer retained possession of Keller's driver's license and registration, he asked if he could look in the trunk of the car. Keller said "sure." The officer looked into the trunk, felt the rear portion of the trunk, and concluded that there was a secret compartment. He asked Keller to follow him to the police station in his own car, and Keller complied. At the station Keller signed a written form consenting to a further search of his car, and the search revealed 19 gallon-size containers of morphine base concealed in a secret compartment in Keller's trunk.

Keller now moves to suppress the fruits of this search. Based on testimony at a hearing held in New Mexico that was submitted on this motion and the exhibits and testimony at hearings before this Court, he argues that: (1) the initial traffic stop was a sham, conducted as a pretext for a drug search; (2) the roadside search of the car trunk was unlawful, in that Keller did not

voluntarily consent to it and the officer lacked probable cause to conduct it; (3) taking Keller to the police station constituted an arrest, for which the officer still lacked probable cause; and (4) the search at the police station was not voluntarily consented to and again was conducted without probable cause.

■ Keller's assertion that the stop for speeding was a mere pretext for a drug search is unsupported by any substantial evidence. Officer Philip Snedecker, who made the stop, testified that he clocked Keller traveling at 57 miles per hour using a radar device that had not been shut off since it was calibrated earlier that day. Keller's reply that he set his cruise control at the speed limit and lowered his speed when his radar detection device indicated that his car was under observation is inadequate to rebut the officer's testimony. The fact that Keller was using a radar detection device and his admission that he was stopped for speeding the previous day in a different state bolster the conclusion that he was speeding. The suggestion that even if Keller was speeding, he was only stopped because he fit a drug courier profile prepared for New Mexico police is unpersuasive,[15] because Snedecker testified that he did not use any such profile, that it was his practice to stop persons traveling two miles over the speed limit, and that he had previously ticketed a local courthouse employee for such a violation.

■ Defendant's next contention is that his consent to the roadside search of his car trunk was not given voluntarily, but was mere "submission to authority" in a situation where the officer held his driver's license and vehicle registration. Whether Keller's consent to search was " 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the

---

15. The defendant offered for the Court's viewing a videotape of a television news segment on the use of traffic stops as an excuse for narcotics searches by New Mexico police. The Court did not view the segment and it finds the program to be inadmissible hearsay. Based on counsel's summary of the tape, however, the Court doubts

such evidence would alter its conclusion, since there is no evidence that this particular stop was a pretext for the search that followed. The issue is therefore to be decided upon the relevant testimony and not on a television journalist's account of methods employed to apprehend narcotics traffickers.

circumstances." [16] The fact that the officer held Keller's license and registration does not in itself vitiate his consent, since consent to a search may be voluntary even if a person is in custody.[17] In this case there is simply nothing to suggest that Keller did not consent voluntarily. There is no suggestion that the officer used force or threatened to use force; the officer and Keller had a friendly conversation about chiropractors and playing squash. Based upon Keller's demeanor in Court, and the fact that he was 40 years of age and had completed two years of college at the time of the search, the Court has no reason to find he was a man easily cowed by authority.

■ Upon the conclusion of his roadside search of Keller's car trunk, Officer Snedecker asked Keller to accompany him to the police station, which was a half mile down the road. Keller asks the Court to find that this request turned his detention into an arrest, which would require a finding of probable cause. However, the fact that Snedecker asked Keller to drive to a nearby location where a more thorough search would be possible does not convert an investigative stop into an arrest. In light of how close the police station was, the situation presented is similar to cases in which persons detained, but not arrested, at airports have been asked to step into the offices of customs officers or drug enforcement agents for further questioning or searches.[18] Whether an individual's detention amounts to an arrest depends upon all the facts, including "the degree of intrusion, the amount of force used, and the extent to which the [individual's] freedom of movement was curtailed." [19] There is no dispute that Keller was asked, not ordered, to drive to the station, that he was permitted to drive in his own car, that he was never physically restrained or threatened with force, and that his detention, starting with the stop on the highway, lasted no more than half an hour. Upon these facts, the Court concludes that Keller was not arrested and that his detention was not equivalent to an arrest.

■ In order to justify his continued detention of Keller, Snedecker needed no more than a "reasonable suspicion" that further investigation would reveal evidence of a crime.[20] Yet Snedecker not only had reasonable suspicion, but he also had "probable cause"—sufficient evidence to justify his belief that there was "a probability or a substantial chance" that the car contained contraband.[21] When Snedecker first approached the car, he detected an odor he was "sure" smelled like cocaine, based upon his participation in three previous cocaine seizures. Upon examining the trunk of the car, Snedecker concluded that there was a secret compartment between the rear seats and the trunk, based upon his observation of a partition in the trunk where he expected to see the rear of the seats; the hardness of the partition; and the distance between the seats and the partition. Based upon the smell and the secret compartment, Snedecker had probable cause to further detain Keller, and if he chose, to arrest him and search the car without a warrant.

At a hearing before this Court, defendant produced expert witnesses who testified that cocaine does not smell sweet, but rather has a weak smell like photo developer; and that in most American cars one would not expect to see the back seats by looking through the trunk. In light of the

**16.** *Shneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

**17.** *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976).

**18.** *See United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *United States v. Oates,* 560 F.2d 45, 57 (2d Cir. 1977); *United States v. Salter,* 521 F.2d 1326, 1328 (2d Cir.1975).

**19.** *United States v. Ceballos,* 654 F.2d 177, 182–83 (2d Cir.1981).

**20.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**21.** *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983).

difficulty lay persons have in describing chemical odors, this Court is satisfied that Snedecker did detect a smell, which, based upon his previous experience in cocaine seizures, he reasonably believed might be cocaine.[22] The Court also accepts that Snedecker, based upon his previous experience with cars, could detect that there was a secret compartment in Keller's trunk. In fact, it was upon his initial inspection that the unusual structure of the trunk area attracted his attention. Even if one assumes that defendant's expert was correct that one cannot see the rear seats of most American cars through their trunks—and there was no testimony concerning the precise make and year of car in question—the expert's testimony that 19 one-gallon jugs would fill a third of the space in the trunk corroborates Snedecker's observation that there was an unusual amount of space behind the partition. This in itself would be sufficient to support Snedecker's belief that a secret compartment existed.

■ Once back at the station, although Snedecker could have searched the car based upon probable cause, he told Keller that he suspected his car contained drugs and asked him to sign a form authorizing a thorough search. Snedecker not only gave Keller the form to read, but he also read it to him. The form, only three sentences long, stated that Keller had "been informed of [his] constitutional right not to have a search made of the premises ... without a search warrant and of [his] right to refuse to consent to such a search." Using his alias "Chris E. Ciro," Keller signed directly below the sentence, "This written permission is being given by me to the above-named persons voluntarily and without threats or promises of any kind." Although Keller asserts that the officers told him that if he did not sign the consent form they would obtain a search warrant and perform the search in a manner that would damage the car, and that he could not leave until a search was conducted, these claims are not credible when viewed in light of the form Keller signed, Snedecker's testimony that Keller's consent was voluntary, and Keller's demeanor in Court, which showed him to be knowledgeable, articulate, and clearly aware of his rights. All evidence obtained from the search is thus admissible.

## Motion For A Separate Trial

■ Defendant Carmine Loiacono moves pursuant to Fed.R.Crim.P. 14 for an order granting him a severance and a separate trial from his codefendants. A defendant seeking such relief bears the heavy burden of "demonstrating facts showing that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial."[23] The basis of the application is that the charges against Loiacono's codefendants are far more numerous and serious than those against himself and that in the course of a trial lasting three or more weeks, evidence admitted only against the Beneventos might spill over to the prejudice of Loiacono. The law is clear, however, that "simply because the evidence against codefendants is stronger or that one defendant's role in the crime is lesser than that of others is not sufficient reason to grant a severance."[24] Defendant's burden is not met "either by counsel's speculation as to how joinder will impact upon the jury or that the defendant may have a better chance of acquittal at separate tri-

---

**22.** The defendant's argument that one could smell nothing through the jars of morphine is irrelevant. There is no contention that the morphine produced the smell that Snedecker detected.

**23.** *United States v. DiPaolo,* 804 F.2d 225, 233 (2d Cir.1986) (quoting *United States v. Rucker,* 586 F.2d 899, 902 (2d Cir.1978)); *United States v. Wilkinson,* 754 F.2d 1427, 1433 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Potamitis,* 564

F.Supp. 1484 (S.D.N.Y.1983), *aff'd,* 739 F.2d 784, 789–91 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984); *United States v. Wilson,* 565 F.Supp. 1416, 1435 (S.D.N.Y. 1983); *United States v. Kahaner,* 203 F.Supp. 78 (S.D.N.Y.1962).

**24.** *United States v. Potamitis,* 564 F.Supp. 1484 (S.D.N.Y.1983), *aff'd,* 739 F.2d 784, 789–91 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984).

als." [25]  The motion for a separate trial is therefore denied, with leave to renew upon the trial.

### Motion for a Bill of Particulars

 Ernesto J. Benevento moves pursuant to Fed.R.Crim.P. 7(f) for a bill of particulars elaborating upon the allegation of a continuing criminal enterprise contained in Count Six of the indictment. The count alleges that certain violations of the law were committed "in concert with at least five other persons with respect to whom Ernesto J. Benevento and Ernest A. Benevento ... each occupied a position of organizer, supervisor and manager." Defendant thus requests a bill specifying: (1) the names and addresses of each person so supervised or managed; (2) whether the Beneventos exercised said supervision or management separately, jointly, or in concert; and (3) the acts of Ernesto J. Benevento upon which the government relies to establish said supervisory or managerial role.

None of these requests need be answered by the government, as the indictment already satisfies the demands of *Wong Tai v. United States.*[26]  The indictment already names six co-conspirators who the government contends were organized, supervised, or managed by the Beneventos. An exhaustive list is not needed.[27]  Similarly, there is no requirement that the government list all overt acts allegedly committed by defendant in furtherance of the conspiracy.[28]  Finally, details as to the degree of cooperation alleged between the Beneventos is not needed for the defendants to "properly ... prepare for trial ... meet the government's case and ... avoid surprise

**25.** *United States v. Wilson,* 565 F.Supp. 1416, 1435 (S.D.N.Y.1983).

**26.** 273 U.S. 77, 80–81, 47 S.Ct. 300, 301, 71 L.Ed. 545 (1927).

**27.** *United States v. Burt,* 765 F.2d 1364, 1367 (9th Cir.1985).

**28.** *United States v. Carroll,* 510 F.2d 507, 509 (2d Cir.1975), *cert. denied,* 426 U.S. 923, 96 S.Ct.

upon the trial.[29]  The motion for a bill of particulars is thus denied.

So ordered.

2633, 49 L.Ed.2d 378 (1976); *United States v. Iannelli,* 53 F.R.D. 482 (S.D.N.Y.1971).

**29.** *United States v. Ianniello,* 621 F.Supp. 1455, 1478 (S.D.N.Y.1985) (quoting *United States v. Wilson,* 565 F.Supp. 1416, 1439 (S.D.N.Y.1983)), *aff'd,* 808 F.2d 184 (2d Cir.1986).