UNITED STATES of America, Appellee,

v.

Ernesto J. BENEVENTO, Ernest A. Benevento, Earl A. Keller, and Carmine Loiacono, Defendants–Appellants.

Nos. 52 to 55, Dockets 87–1173 to 87–1176.

United States Court of Appeals, Second Circuit.

Argued Sept. 1, 1987.

Decided Dec. 18, 1987.

J. Jeffrey Weisenfeld, New York City (Goldberger & Dubin, P.C., New York City, of counsel), for defendants-appellants.

John K. Carroll, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Kerri L. Martin, Asst. U.S. Atty., of counsel), for appellee.

Before FEINBERG, Chief Judge, PIERCE and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendants-appellants Ernesto J. and Ernest A. Benevento, Earl A. Keller, and Carmine Loiacono appeal from judgments of conviction entered in the United States District Court for the Southern District of New York after a four-week jury trial before Judge Edward Weinfeld. After the district court denied their motions to suppress evidence, *see* 649 F.Supp. 1379 (S.D. N.Y.1986), defendants were tried on a seven-count indictment. The indictment charged Ernesto J. and Ernest A. Benevento, inter alia, in count one with conspiracy to manufacture and distribute heroin in violation of 21 U.S.C. § 846, in counts four and five with participating in a racketeering enterprise, the "J.E.M. Corporation," through a pattern of racketeering activity and with conspiring to violate the racketeering laws in violation of 18 U.S.C. §§ 1962(c) and 1962(d), and in count six with conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848. Loiacono was charged with participating in the narcotics conspiracy and with the substantive RICO and RICO conspiracy violations. Keller was indicted only for participating in the narcotics conspiracy. After the jury convicted defendants of all crimes charged in the indictment, Judge Weinfeld sentenced them. In particular, he sentenced Ernesto J. and Ernest A. Benevento to serve, inter alia, concurrent terms of imprisonment on both the narcotics conspiracy and the continuing criminal enterprise counts.

On appeal, Ernesto J. and Ernest A. Benevento and Keller contend that the district court erred in denying their suppression motions. In addition, the Beneventos claim that the district court erred when it sentenced them on both the narcotics conspiracy and the continuing criminal enterprise counts. Ernest A. Benevento appeals separately, arguing that the district court erred when it instructed the jury that it could find him guilty on the continuing criminal enterprise count if the jury found that he aided and abetted Ernesto J. Benevento in conducting a continuing criminal enterprise. Loiacono contends, inter alia, that the government's evidence at trial was insufficient to establish that he violated the racketeering laws and that his convictions on both the substantive RICO and RICO conspiracy counts violated the double jeopardy clause of the fifth amendment.

For the reasons stated below, we affirm the judgments of conviction for the defendants on all counts, except we reverse Ernest A. Benevento's conviction on the continuing criminal enterprise charge in count six, and we vacate Ernesto J. Benevento's sentence on the narcotics conspiracy charge in count one.

## Facts and Background

The government's evidence at trial established that, in early 1982, the Beneventos, Loiacono, and Keller, along with their criminal associates in the United States, Mexico, and Europe, joined together to form a criminal enterprise known as the "J.E.M. Corporation" ("J.E.M."). J.E.M. was organized for the purpose of facilitating a large-scale, international heroin manufacturing and distribution conspiracy. As part of this conspiracy, J.E.M. planned to 1) import into the United States various raw materials necessary for the manufacture of

heroin, 2) convert those raw materials into a highly pure form of heroin, and 3) distribute the manufactured heroin through a network of distributors in the metropolitan New York area. By the time of J.E.M.'s discovery by government agents, it had completed its first manufacturing and distribution venture and planned additional ventures of similar magnitude.

During the first phase of J.E.M.'s operations, Ernesto J. Benevento, Loiacono, and others associated with J.E.M. purchased overseas large quantities of morphine base and surreptitiously imported it into the United States aboard a ship in South Florida, near West Palm Beach. Once the morphine base was successfully shipped into the United States, J.E.M. arranged to transport it to a house in Chandler, Arizona, owned by Ernesto J. Benevento's uncle, Ernest A. Benevento, where a laboratory had been set up to facilitate the heroin manufacturing and conversion process.

Keller served as J.E.M.'s principal courier for shipping the morphine base from Florida to Arizona. In April 1984, Keller began shuttling back and forth in an automobile between West Palm Beach, Florida, and Chandler, Arizona, with plastic jugs containing morphine base hidden in the trunk of the car. In June 1984, when Keller was on the last courier run to Arizona, he was stopped for speeding by New Mexico State Police Patrolman Phillip Snedeker. After Snedeker stopped Keller and approached his automobile, he detected an odd odor, which he believed was associated with cocaine, emanating from the car. His suspicions aroused, Snedeker asked Keller if he could inspect the trunk of the car, and Keller agreed. Snedeker observed that the trunk had been altered to include a partition which created a hidden compartment between the back of the trunk and the passenger compartment. Snedeker then requested that Keller accompany him a short distance to the local state police office for a more thorough search. Keller complied and followed Snedeker to the police station in his automobile.

Upon arriving at the police station, Snedeker asked Keller whether the police could conduct a search of the automobile. Keller agreed and executed a consent form which authorized the search. The ensuing search uncovered nineteen plastic jugs containing morphine base. The jugs were hidden in the trunk of the automobile behind the partition that Snedeker had observed. The New Mexico police then arrested Keller.

Through Keller's efforts, approximately 300 kilograms of morphine base were transported to the Arizona laboratory. While morphine base was being transported to Arizona, Ernesto J. Benevento, Loiacono, and their associates proceeded to hire two drug chemists, Francois Scapula and Charles Altieri, to conduct the heroin manufacturing and conversion process. Thereafter, J.E.M. arranged to smuggle Scapula and Altieri into the United States aboard Ernesto J. Benevento's yacht. Once inside the United States, Scapula and Altieri flew to Arizona and began the manufacturing process under the supervision of Ernesto J. Benevento and Loiacono. When the manufacturing process was complete, J.E.M. began distributing the heroin. Employing six distribution groups located in metropolitan New York, J.E.M. sold approximately 146 kilograms of heroin from July 1984 to March 1985 for a gross profit of approximately $23 million.

Due to the success of the first venture, J.E.M. began planning a second venture, "project 2," which was to be of similar organization and magnitude as the first. To fund the second venture, the Beneventos, Loiacono and their associates each contributed $200,000. Since much of the initial activity for the second venture was to take place outside the United States, J.E.M. had to smuggle the investment capital out of the country. For this purpose, J.E.M. conscripted Fatima dos Santos Nobre, Scapula's girlfriend, to serve as a currency courier. By this time, however, J.E.M.'s operations had fallen under the scrutiny of the Drug Enforcement Agency ("DEA"), and DEA agents maintained surveillance over Nobre during her trips out of the county while smuggling currency. Thus, in March 1985, during Nobre's first currency smuggling trip, and after she had checked in for

her flight from Miami to Geneva, Switzerland, DEA agents seized her luggage and searched it. In her luggage, agents found currency in excess of $400,000 for which Nobre had not filed a currency declaration. The agents then seized the currency and marked her bags in such a manner to suggest that an airline employee, or some other person, had tampered with them to avoid Nobre's suspicion of the DEA agents' actions.

In May 1985, when Nobre prepared for a second currency smuggling trip, she met Ernesto J. Benevento at a hotel in New York City, where she was given several hundred thousand dollars in currency earmarked for the second drug venture. Benevento then drove Nobre to Kennedy International Airport and accompanied her as she checked-in for a SwissAir flight to Geneva. Once Nobre had checked her luggage with SwissAir government agents seized the luggage and searched it. As a result of this search, the agents discovered the currency given her by Benevento. To avoid suspicion, however, they did not seize the currency, but photographed it before replacing it in Nobre's luggage.

The following month, Ernesto J. and Ernest A. Benevento attempted to make another currency smuggling run for J.E.M. The Beneventos arrived at Kennedy International Airport and checked their luggage with SwissAir prior to the departure of a flight to Geneva. When they checked in for the flight, however, a SwissAir employee recognized Ernesto J. Benevento as the man who had accompanied Nobre one month earlier when government agents searched her luggage for currency. SwissAir officials then alerted Customs Special Agent Joseph Henderson as to Benevento's presence on the flight. Henderson proceeded to seize the luggage Benevento had checked for the flight and searched it. In the luggage, Henderson discovered $956,-000 in currency for which the Beneventos had not filed outgoing currency declarations. Customs agents then arrested the Beneventos for currency violations as they were boarding their flight to Geneva.

From the time of their arrest on the currency charges in June 1985, until they were arrested on the narcotics conspiracy charges in May 1986, the Beneventos remained free on bail. During this time, the government's investigation into the narcotics conspiracy was continuing and culminated in the search of the Beneventos' Florida homes, as well as searches of other locations suspected of containing evidence of J.E.M.'s operations, including the Arizona laboratory. The search of the Beneventos' homes yielded computer records maintained by Ernest A. Benevento which included detailed financial accounting information regarding J.E.M.'s drug operations.

In December 1986, the grand jury indicted the defendants and charged all of them in count one with participating in a narcotics manufacturing and distribution conspiracy in violation of 21 U.S.C. § 846 (the "narcotics conspiracy" count). The Beneventos were charged in count two with interstate travel in aid of racketeering violation of 18 U.S.C. § 1952 and Ernesto J. Benevento was charged in count three with a separate violation of section 1952. The Beneventos and Loiacono were charged in count four with participating in a racketeering enterprise from January 1982 through May 1986 in violation of 18 U.S.C. § 1962(c) ("substantive RICO" count), and the indictment set forth as predicate acts the narcotics conspiracy, a conspiracy to import morphine base into the United States, failure to file outbound currency declarations and interstate travel in aid of racketeering. The Beneventos and Loiacono were charged in count five with conspiracy to participate and conduct the affairs of a RICO enterprise, the J.E.M. Corporation, in violation of 18 U.S.C. § 1962(d) ("RICO conspiracy" count) and this count alleged the same predicate acts that were set forth in count four. In count six, the Beneventos were charged with conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848 (the "CCE" count).

Prior to trial, the Beneventos and Keller filed motions to suppress evidence. Keller moved to suppress evidence that resulted from the search of his automobile, and the Beneventos moved to suppress, inter alia,

evidence obtained from the search of their luggage at Kennedy International Airport and the searches of their Florida homes. The district court denied Keller's and the Beneventos' suppression motions. *See* 649 F.Supp. 1379 (S.D.N.Y.1986).

At trial, the government overwhelmingly established the defendants' guilt of the crimes charged in the indictment. The computer records obtained from Ernest A. Benevento's home substantially corroborated the government's witnesses' testimony and set out in detail the intricacies of J.E.M.'s international drug operations. On March 27, 1987, after the jury returned a guilty verdict against all defendants on each count in the indictment, Judge Weinfeld sentenced the defendants as follows: Ernesto J. Benevento was sentenced to two concurrent twenty-five-year terms of imprisonment on counts one and six, twenty-year terms on counts four and five, five-year terms on counts two and three and was ordered to pay a $500,000 fine on counts one and two. Ernest A. Benevento was sentenced to four concurrent eighteen-year terms of imprisonment on counts one, four, five and six, a five-year term on count two and was ordered to pay a $250,000 fine on counts one and four. Judge Weinfeld sentenced Loiacono to three concurrent fifteen-year terms of imprisonment on counts one, four and five and ordered him to pay a $100,000 fine on count one. Keller was sentenced to a ten-year term of imprisonment on count one.

## DISCUSSION

A. *Denial of motion to suppress the morphine base evidence.*

Keller presents several arguments in support of the conclusion that the district court erred in denying his motion to suppress the morphine base evidence. Keller's main contention is that the district court erred when it found that his detention, starting with the roadside stop and continuing through to his detention at the police station, constituted a permissible investigative detention pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See* 649 F.Supp. at 1385–87. Kel-

ler argues that, once he accompanied Snedeker to the police station while Snedeker retained his license and vehicle registration, the initial roadside traffic stop was transformed into an arrest and that, because this constructive arrest allegedly was not supported by probable cause, it was illegal. Keller argues, accordingly, that the morphine base evidence constituted fruits of an illegal arrest and thus should have been suppressed.

We see some merit in Keller's contention that the scope of a permissible *"Terry stop"* may not extend as far as the district court's view would permit. Indeed, in a factually similar context, a divided panel of the Tenth Circuit held that, when an officer retains an individual's driver's license and vehicle registration and requests that the individual return with the officer to the police station, that individual has been seized within the meaning of the fourth amendment, and the seizure must therefore be supported by probable cause. *See United States v. Gonzalez*, 763 F.2d 1127, 1130–33 (10th Cir.1985).

Nevertheless, we need not reach this question because we agree with the district court's alternate holding that Snedeker had probable cause to search the automobile and arrest Keller at the roadside. *See* 649 F.Supp. at 1386. In support of its finding of probable cause, the district court found that, after stopping Keller's automobile, Snedeker detected an odor, which he believed smelled like cocaine, emanating from the car. Then, after conducting a consensual inspection of Keller's trunk, Snedeker noticed the presence of a partition, which structurally altered the trunk and created a hidden compartment between the rear of the trunk and the back of the passenger compartment. On the basis of these factual findings, the district court concluded that Snedeker had a reasonable belief that Keller was carrying contraband in the automobile and thus had probable cause to search the vehicle and arrest Keller. *Id.*

Probable cause "requires only a probability or substantial chance of criminal activity, [and] not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213,

243–44 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). Determination of whether probable cause is present must be drawn from an evaluation of "the totality of the circumstances," *id.* at 241, 103 S.Ct. at 2334, and the appropriate standard must be applied in a "flexible, common-sense" manner. *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983). Moreover, a district court's determination of probable cause is given "great deference" on appeal. *See United States v. Vasquez,* 634 F.2d 41, 45 (2d Cir.1980).

■ The district court's factual findings clearly indicate that there was a substantial likelihood that Keller's car contained contraband. Thus, from the totality of these circumstances, probable cause existed to search the automobile and arrest Keller at the roadside. Even though Snedeker did not formally arrest Keller at the roadside, he legally could have. Moreover, Snedeker did not lose the right to search the vehicle and arrest Keller by delaying the search until he arrived at the station house. *See United States v. Johns,* 469 U.S. 478, 485–88, 105 S.Ct. 881, 885–87, 83 L.Ed.2d 890 (1985). We therefore conclude that the district court did not err in denying Keller's suppression motion because, even if we were to find that his detention was transformed into a constructive arrest, that arrest was lawful since it was supported by probable cause.

■ Keller's remaining contentions— that the district court erred when it found 1) Snedeker stopped Keller's automobile for a traffic violation, rather than because Keller fit some so-called drug courier profile, 2) Keller *voluntarily* allowed Snedeker to examine the trunk of his automobile, and 3) Keller *voluntarily* executed the consent form, which authorized the automobile search at the police station—represent challenges to the district court's resolution of essentially factual questions, which it made after conducting an evidentiary hearing. Without restating the facts as found by the district court, we are satisfied that its conclusions were fully supported by evidence in the record, and thus are not clearly erroneous. *See United States v. Mast,*

735 F.2d 745, 749 (2d Cir.1984); *United States v. Lace,* 669 F.2d 46, 52 (2d Cir.), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982); *United States v. Price,* 599 F.2d 494, 503–04 (2d Cir.1979).

**B.** *Denial of motions to suppress the currency found in the Beneventos' luggage.*

The Beneventos appeal from the district court's order which denied their motions to suppress the currency found in their luggage at Kennedy International Airport. *See* 649 F.Supp. at 1381–82. The Beneventos contend, first, that the customs agent's search of their luggage violated their fourth amendment rights because the search occurred without a warrant and without probable cause; and, second, that the search violated 31 U.S.C. § 5317(b) because the customs agent did not have "reasonable cause to believe" they were carrying currency in their luggage at the time he conducted the search.

In its decision denying the suppression motions, the district court rejected both of the Beneventos' contentions. The district court concluded that the search did not violate the Beneventos' constitutional rights because it found that the search fell within the so-called "border search" exception to the fourth amendment. *See* 649 F.Supp. at 1382. Turning to defendants' section 5317 argument, the district court held that, even if the customs agent's search violated that section, the evidence seized would nevertheless be admissible because no exclusionary remedy is provided for in the statute. *Id.* at 1381–82. We agree with both of the district court's legal conclusions.

Although the district court did not conduct an evidentiary hearing, nor did it make factual findings, we have the benefit of the customs agent's affidavit filed in the district court, which sets forth the factual context in which the luggage search occurred. On June 3, 1985, while Customs Special Agent Joseph Henderson was on duty at the International Arrivals Building at Kennedy Airport, he was contacted by the SwissAir station manager. The station

manager informed Henderson that one of his employees had recognized a passenger who had checked in for a flight to Geneva, Switzerland. The SwissAir employee remembered the passenger, who was later identified as Ernesto J. Benevento, as having accompanied a female passenger on a previous SwissAir flight to Geneva one month earlier, and, on that occasion, the female passenger's luggage had been stopped and searched for currency violations. On the basis of this information, Henderson proceeded to the SwissAir baggage loading area and searched the Beneventos' luggage for possible currency violations. In the luggage, Henderson found approximately $952,000 in cash for which the Beneventos had not filed the required outgoing currency declarations. Subsequent to the search, Henderson learned the specifics of the prior search involving Nobre. Thus, he discovered that, on May 2, 1985, customs agents had opened the luggage of Ms. Nobre as she prepared to board a SwissAir flight to Geneva, Switzerland, and, in her luggage, agents observed currency in excess of $200,000. On that prior occasion, Ernesto J. Benevento accompanied Nobre to the airport and checked her in for the flight.

■ At the outset, it is clear that Henderson's search of the luggage did not violate the Beneventos' constitutional rights. The facts set forth above establish that the search fell within the so-called "border search exception" to the fourth amendment, which allows government agents to conduct inspections at the border without a warrant and without probable cause. *See United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977). Here, Henderson searched the Beneventos' luggage at the airport as it was being prepared for loading onto the SwissAir flight to Geneva. Thus, although the search occurred as the Beneventos were departing the country, it

nevertheless constituted a permissible border search and thus was not violative of the defendants' fourth amendment rights. *See United States v. Ajlouny,* 629 F.2d 830, 834–35 (2d Cir.1980) (border search exception applies to searches of persons departing country as well as to searches of persons entering the country), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981); *United States v. Swarovski,* 592 F.2d 131, 133 (2d Cir.1979) (same).

■ Despite the absence of any constitutional provision prohibiting customs agents from conducting routine currency searches at the border, Congress has on three occasions enacted legislation that limited the scope of such searches. In 1970, Congress enacted Pub.L. No. 91–508, 84 Stat. 1114, which, *inter alia,* granted authority to the Secretary of the Treasury to apply to any court of competent jurisdiction for a warrant, based on probable cause, to search any person reasonably believed to be in the process of illegally transporting monetary instruments. Pub.L. No. 91–508, § 235(a), 84 Stat. 1114, 1123–24 (1970). When Congress recodified Title 31 of the United States Code in 1982, it retained the probable cause and warrant requirement. *See* 31 U.S.C. § 5317(a) (1982) (current version at 31 U.S.C.A. § 5317(b) (West Supp.1987)). In 1984, however, Congress amended this statute to permit customs officers to stop and search, without a warrant, "any person entering or departing from the United States with respect to whom the officer has *reasonable cause* to believe there is a monetary instrument being [illegally] transported." 31 U.S.C. § 5317(b) (Supp.III 1985) (current version at 31 U.S.C.A. § 5317(b) (West Supp.1987)) ("section 5317(b)"). Because the Beneventos' luggage was searched at a time when this last-mentioned statute was in effect, the search was lawful only if it was supported by "reasonable cause." [1]

1. Section 5317 was again amended in October 1986 to provide that

For purposes of ensuring compliance with the requirements of section 5316, a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, any envelope or other container, and any person entering or departing from the United States.

*See* Pub.L. 99–570, Title I, § 1355, 100 Stat. 3207–22 (October 27, 1986). As amended, section 5317 no longer requires that customs

The "reasonable cause" standard of section 5317(b) has been equated with "reasonable suspicion." *See, e.g., United States v. Hernandez–Salazar*, 813 F.2d 1126, 1138 (11th Cir.1987); *United States v. Turner*, 639 F.Supp. 982, 985 n. 1 (E.D.N.Y.1986). "Reasonable suspicion" in turn, is a lesser standard than probable cause, but requires more than just an "inchoate and unparticularized suspicion or 'hunch.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 346, 105 S.Ct. 733, 746, 83 L.Ed.2d 720 (1985).

Given the circumstances surrounding this case, it appears that Henderson's decision to search the Beneventos' luggage for currency was based on no more than an "unparticularized suspicion or 'hunch.'" In his affidavit in opposition to the Beneventos' suppression motion, Henderson stated:

On June 3, 1985, ... I was on duty at ... John F. Kennedy Airport, New York, New York. At that time, I was contacted at my station by the Swissair station manager. In substance and among other things, that manager advised me that a Swissair employee had advised him that a passenger who had checked in to board Swissair flight 111 was familiar to that employee. Particularly, I was informed that the employee recognized Ernesto J. Benevento as an individual who, with another female individual, had checked baggage with Swissair on a recent occasion. On that prior occasion, the baggage had been the subject of an outbound currency search.

*Subsequent* to [the currency search], I learned that on or about May 2, 1985, Customs Service officers opened the luggage of Fatima dos Santos Nobre as she prepared to board Swissair flight 111 to Geneva, Switzerland. In that luggage they observed at least $200,000 in United States currency. I *subsequently* also learned that Ernesto J. Benevento had checked Nobre in at the Swissair desk on that date.

Joint Appendix at 184–85 (emphasis added). On the basis of the foregoing affidavit, it does not appear that the currency search was conducted in accordance with the customs agent's reasonable suspicion. The evidence suggests that Henderson relied solely on the hearsay statement of the Swissair manager that, on some prior occasion, Ernesto J. Benevento had checked some luggage that had been subjected to a currency search; significantly, there is *no* evidence that Henderson was aware of the *result* of the previous search of Nobre's luggage. To conclude that Henderson had reasonable suspicion in this context would suggest that the mere fact that a person (or his companion) has been subjected to a prior search is sufficient to cast a shadow of suspicion over that person for some indeterminate period of time—regardless of the fact that the previous search may have turned up no evidence of criminal activity. In the absence of any evidence that Henderson was aware of the result of the previous search, we conclude that the currency search was not supported by reasonable suspicion.

We nevertheless conclude that the district court properly denied the Beneventos' suppression motions. As the district court reasoned, there is nothing in the legislative history of section 5317(b) indicating that Congress intended an exclusionary remedy for violations of the statute. Instead, "the fact that the exclusionary rule is the remedy for Fourth Amendment violations carries no force in this instance," because the amendment does not apply *at all* to routine border searches. *See* 649 F.Supp. at 1382. Moreover, Congress has *expressly* provided for the exclusion of evidence obtained in violation of *other* federal statutes. *See, e.g.*, 18 U.S.C. § 2518(10)(a) (providing an exclusionary remedy for evidence obtained in violation of the federal wiretapping statute); 50 U.S.C. § 1806(e)–(g) (providing an exclusionary remedy for illegal military wiretaps). In addition, as the district court noted, in passing section 5317(b) Congress intended to

agents have "reasonable cause to believe" that currency violations are present before conducting a search, and thus appears to authorize currency searches to the extent allowed by the Constitution.

bestow greater powers on federal agents to prevent drug traffickers from engaging in currency smuggling. Consequently, in the absence of any evidence of an intent to the contrary, the courts "should not weaken the manifest purpose of the statute." 649 F.Supp. at 1382. Finally, we note that suppression may not be the only means of deterring unlawful currency searches; conceivably, the victims of the unlawful search may have an implied cause of action against the violating officer. *United States v. Chemaly,* 741 F.2d 1346, 1358–59 (11th Cir.1984) (Tjoflat, J., dissenting), *reinstated,* 764 F.2d 747 (1985) (en banc). Accordingly, we conclude that the district court properly denied the Beneventos' motions to suppress the currency evidence.

C. *Denial of motions to suppress evidence recovered after search of Florida homes.*

The Beneventos next contend that the district court erred in denying their motions to suppress the evidence obtained from the search of their Florida homes. The Beneventos argue that the government's affidavits—upon which the search warrant applications and the magistrate's probable cause determination were made—contained "serious omission[s]" which "patently affected" the magistrate's probable cause determination. They argue, pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), that the omissions were deliberate and materially misled the magistrate who issued the search warrants. They conclude that the search warrants were therefore illegal and that the evidence seized pursuant to the warrants should have been suppressed. The district court rejected these arguments after it found that the government's affidavits did not contain material omissions. The district court also concluded that the magistrate's finding of probable cause to search was supported by the evidence in the government's affidavits. *See* 649 F.Supp. at 1383–84. We agree.

The Beneventos point out that the search warrants were issued by the magistrate on June 4, 1986 and, at that time, no evidence was presented to the magistrate which demonstrated that the Beneventos had committed a crime since their arrest at Kennedy International Airport in June 1985. The Beneventos claim that the government failed to bring to the magistrate's attention the "one year gap in the government's information" as to the Beneventos' criminal activity, i.e., from June 1985 to June 1986. The Beneventos contend that this represented a material omission because, had it been brought to the magistrate's attention, it would have shown that there was no connection between the Beneventos' prior criminal activity and their current Florida homes.

We agree with the district court's conclusion that this claimed "omission" was in fact not an omission at all. As the district court stated,

[t]he government's affidavits ... are not misleading. They clearly identified the dates of the Beneventos' suspected criminal activity as prior to June 3, 1985, and they made no claim that there was continuing criminal activity at the Beneventos' residences.

*See* 649 F.Supp. at 1383–84. Accordingly, we find that the district court properly rejected the Beneventos' claim that the search warrant applications contained material omissions.

We also agree with the finding of the district court that probable cause to search the homes was present. The affidavits filed by the government in support of its search warrant applications contained extensive testimony regarding the Beneventos' involvement in an international narcotics conspiracy and contained specific statements from the government's confidential informants that provided key details of various aspects of the narcotics conspiracy. Included in the applications was the testimony of DEA Agent Pharao, who stated that, based upon his extensive experience in drug enforcement investigations, it was his opinion that drug traffickers, as the Beneventos were alleged to be, were likely to keep various items of evidence of drug-related activity including transactions records, large sums of currency, etc., in their personal homes. In addi-

tion, the warrant applications included other information that suggested a link between the Beneventos' Florida homes and their prior criminal activity. *See* 649 F.Supp. at 1382–83.

Several courts have held that a government agent's expert opinion, such as that provided by Agent Pharao here, "is an important factor to be considered by the judge" when making a probable cause determination. *See United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985) (and cases cited therein). Although Pharao's testimony, standing alone, might not be sufficient to establish a link between the Beneventos' current homes and their prior criminal activity, *see United States v. Gomez,* 652 F.Supp. 461, 463 (E.D.N.Y.1987), when viewed together with the other evidence in the government's affidavits, we are satisfied that probable cause to believe that evidence of prior criminal activity was located in their homes was amply demonstrated. Accordingly, we affirm district court's order which denied the Beneventos' motions to suppress the evidence obtained from their Florida homes.

### D. *Aiding and abetting liability under 21 U.S.C. § 848.*

Ernest A. Benevento appeals his conviction on the continuing criminal enterprise charge in count six of the indictment. Benevento contends that the district court erred in instructing the jury that it could find him guilty of violating section 848 if it found that he aided and abetted Ernesto J. Benevento in the operation of a continuing criminal enterprise. Benevento acknowledges that the indictment charged him as a principal, as well as an accomplice, and he does not deny that the jury's instructions on direct liability under that section were correct. He argues, however, under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), that where two instructions are given to the jury and one version is correct and the other erroneous and where it cannot be deduced which instruction the jury followed, the conviction must be reversed. *See* 442 U.S. at 526, 99 S.Ct. at 2460.

The government did not respond to Benevento's *Sandstrom* argument, and it appears from the government's brief that it all but concedes that Benevento could not have been found guilty directly under section 848—presumably because trial evidence did not sufficiently establish that he coordinated or managed five or more individuals in the conduct of the enterprise. *See* 21 U.S.C. § 848(d). Nevertheless, the government argues that, under limited circumstances, aiding and abetting liability is appropriate in section 848 cases. The government acknowledges that mere employees of an enterprise may not be convicted under that section, but contends that an individual who provides substantial assistance to the criminal enterprise's principal and who acts in a managerial capacity while furthering the enterprise's activities, should be held liable as an aider and abettor, even if he could not be held liable as a principal. The government suggests that the evidence at trial demonstrated that Benevento engaged in managerial functions throughout J.E.M.'s drug operations and provided substantial assistance to Ernesto J. Benevento. The government points out that Benevento provided J.E.M. with the use of his Arizona home for the drug manufacturing laboratory, maintained detailed financial records for the enterprise on his computer at home, contributed substantial amounts of capital to fund the second drug venture and attempted to smuggle currency out of the United States for J.E.M. The government concludes that, in Benevento's case, aiding and abetting liability would be appropriate.

Recently, in a decision issued after oral argument in the instant appeal, this court determined that aiding and abetting liability, pursuant to 18 U.S.C. § 2, is not available in prosecutions under section 848. *See United States v. Amen,* 831 F.2d 373, 381–82 (2d Cir.1987). In light of our decision in *Amen,* we conclude that the district court erred when it instructed the jury that it could convict Benevento under section 848 if it found that he aided and abetted Ernesto J. Benevento in operating a continuing criminal enterprise. Furthermore, because it appears that the evidence

at trial was insufficient to convict Benevento as a principal under that section, we reverse his conviction on the continuing criminal enterprise charge in count six. *See Amen,* 831 F.2d at 382.

### E. *Substantive RICO and RICO conspiracy counts.*

Loiacono appeals his convictions on counts four and five of the indictment, which charged him with substantive and conspiracy violations of the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1962(c) and (d). Loiacono contends, first, that, because the two conspiracies alleged in the indictment as predicate acts arose from a single "overall" conspiracy, the government has failed to satisfy RICO's pattern requirement, 18 U.S.C. § 1961(5); and, second, that his conviction on *both* the substantive RICO and the RICO conspiracy counts violates the double jeopardy clause of the fifth amendment. We disagree.

### 1. The pattern requirement.

■ To satisfy the pattern requirement in a RICO prosecution, the government must prove that the defendant committed at least two of the predicate acts listed in section 1961(1) within ten years of each other. *See* 18 U.S.C. § 1961(5); *United States v. Ianniello,* 808 F.2d 184, 189–93 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987). The indictment charged as predicate acts that Loiacono participated in a conspiracy to import morphine base into the United States in violation of 21 U.S.C. § 963 and participated in a conspiracy to manufacture and distribute heroin in violation of 21 U.S.C. § 846. Conspiracies to violate the narcotics laws, if proven, are properly chargeable as predicate acts. *See United States v. Ruggiero,* 726 F.2d 913, 918 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Weisman,* 624 F.2d 1118, 1123–24 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); 18 U.S.C. § 1961(1)(D).

■ At issue, then, is whether the conspiracies are separate crimes or a single

crime. Since a defendant can conspire only to import drugs or only to distribute them, we think that each conspiracy can exist independently, and a defendant could be convicted of one or of both without violating the double jeopardy clause. The fact that Loiacono committed both crimes as part of a single plan does not invalidate the RICO conviction, since this circuit has rejected the view that a pattern of racketeering activity or a racketeering enterprise must consist of multiple ventures or plans. So long as the defendants commit at least two predicate acts, they have met the pattern requirement and, so long as the enterprise is long and elaborate enough to be considered continuing, the enterprise requirement is satisfied. *See Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 51 (2d Cir.), *petition for cert. filed,* 56 U.S.L.W. 3322 (Oct. 13, 1987) (No. 87–616); *Ianniello,* 808 F.2d at 190–92.

■ If anything, the relatedness of the two conspiracies makes the case against Loiacono more compelling because this relationship highlights the continuity in the enterprise. The conspiracy to import morphine base was part of a larger plan that included the narcotics manufacturing and distribution conspiracy. In addition, trial evidence established that defendants planned additional narcotics ventures, and even had taken steps towards a second venture. Accordingly, we find that the predicate acts of racketeering charged in the indictment and proven at trial satisfy the requirements of the RICO statute precisely because they were two important aspects of a large-scale, continuous drug enterprise.

### 2. Double jeopardy.

■ Loiacono contends that, where the underlying predicate acts alleged in a RICO prosecution are conspiracies, a conviction under both the substantive RICO and RICO conspiracy sections, 18 U.S.C. §§ 1962(c) and (d), violates the double jeopardy clause of the fifth amendment. We disagree.

"A single transaction may give rise to liability for distinct offenses under sepa-

rate statutes without violating the Double Jeopardy Clause." *United States v. Biasucci*, 786 F.2d 504, 515 (2d Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986) (quoting *United States v. Barton*, 647 F.2d 224, 235 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981)). The applicable test for determining whether two offenses are sufficiently distinct to allow prosecutions under each statute is that set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not ...

*See Albernaz v. United States*, 450 U.S. 333, 337–38, 101 S.Ct. 1137, 1141, 67 L.Ed. 2d 275 (1981); *Biasucci*, 786 F.2d at 515–16.

Loiacono's convictions under the statutory provisions at issue here, 18 U.S.C. §§ 1962(c) and 1962(d), satisfy the *Blockburger* test. To establish the existence of a RICO conspiracy, the government was required to prove only the existence of an agreement to violate RICO's substantive provisions. Thus, the government necessarily had to establish that Loiacono agreed with his criminal associates to form the RICO enterprise, the J.E.M. Corporation, agreed to associate himself with that enterprise and agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise. In contrast, Loiacono's conviction on the substantive RICO count required proof, not of an agreement to violate the substantive RICO sections, but actual proof that Loiacono associated himself with the enterprise and committed at least two predicate acts in connection with the conduct of the enterprise.

The significant distinctions between the proof required to establish the RICO conspiracy and the underlying substantive RICO offense belie Loiacono's claim that

convictions under both the substantive and conspiracy counts violate the double jeopardy clause. *See Pinkerton v. United States*, 328 U.S. 640, 643–44, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946) (convictions under both a conspiracy statute and underlying offense do not violate double jeopardy clause). Although the predicate acts charged under the two offenses were the same, proof of the acts was only one element necessary to establish Loiacono's guilt of those offenses. Accordingly, because the *Blockberger* test was satisfied here, we find no double jeopardy violation.

**F. *Merger of lesser included offense into continuing criminal enterprise conviction.***

Ernesto J. Benevento contends, and the government agrees, that the district court erred in sentencing him to concurrent terms of imprisonment on *both* count one, the narcotics conspiracy count, and count six, the continuing criminal enterprise count. The parties agree that the narcotics conspiracy charge is a lesser included offense of a continuing criminal enterprise violation, and it is clear that "a conviction on a lesser included offense may not stand as a separate conviction." *United States v. Osorio Estrada*, 751 F.2d 128, 134 (2d Cir.1984), *modified on reh'g on other grounds*, 757 F.2d 27, *cert. denied*, 474 U.S. 830, 106 S.Ct. 97, 88 L.Ed.2d 79 (1985).

 When an individual is sentenced on both a lesser and greater offense, the conviction on the lesser charge is "combined" with the conviction on the greater offense, although it is not "merged out of existence." *Id.* at 135. Nevertheless, the conviction on the lesser offense may not have any collateral effect, unless the conviction on the greater charge is subsequently overturned. *See United States v. Aiello*, 771 F.2d 621, 634–35 (2d Cir.1985). We therefore vacate Ernesto J. Benevento's sentence on count one, and we remand for the purpose of combining the conviction on the lesser offense with that on the greater offense and for resentencing.

## CONCLUSION

We have considered the defendants' remaining arguments and find that each of them is without merit. In view of the foregoing, the judgments of conviction are affirmed, except Ernest A. Benevento's conviction on the continuing criminal enterprise charge in count six is reversed, and Ernesto J. Benevento's sentence on the narcotics conspiracy charge in count one is vacated and the matter is remanded.