711 So.2d 1269 (1998)
In re FORFEITURE OF ONE HUNDRED SEVENTY-ONE THOUSAND NINE HUNDRED DOLLARS ($171,900) IN UNITED STATES CURRENCY.
No. 97-2574.
District Court of Appeal of Florida, Third District.
May 20, 1998.
*1271 Alfred Aronovitz, Miami, for appellants Ana Carmen Ledezma de Campero, Marina Castro de Ledezma, and Lecam Associados, S.R.L.
Judith E. Secher, for appellee Metro-Dade Police Department.
Before NESBITT, GREEN and FLETCHER, JJ.
NESBITT, Judge.
This civil forfeiture action arose after the Metro-Dade Police Department seized one hundred seventy-one thousand nine hundred dollars ($171,900) in U.S. currency from Marina Castro de Ledezma (Ledezma) at the Miami International Airport (MIA), pursuant to a random United States Customs (Customs) border search. Ledezma, stopped as she was about to board an international flight bound for Bolivia, was allegedly carrying the currency for Lecam Asociados (Lecam) on behalf of Ana Carmen Ledezma de Campero (Campero). Ledezma, Campero and Lecam will hereafter be collectively referred to as "Claimants" and are the appellants here. Claimants appeal the trial court's determination following an adversarial preliminary hearing that Metro-Dade Police had probable cause to pursue this forfeiture action against the Claimants, pursuant to the Florida Contraband Forfeiture Act.[1] We affirm.
Ledezma was stopped with a carry-on bag full of U.S. currency at MIA by Customs officers just prior to her boarding a flight to Bolivia. Ledezma was questioned about the currency by Customs officers and by Metro-Dade *1272 Police Detective Pedro Fernandez, who is also a duly authorized Customs officer.[2] She asserted that she was a courier for Lecam and that the currency represented proceeds from the sale of gold brought from Bolivia to Republic Metals, a metal refinery in Dade County. Ledezma produced a Customs Form 4790 declaring that she was departing the United States with the currency. Unsatisfied with Ledezma's explanation regarding the currency, Fernandez and other Customs officers asked Ledezma if she was licensed to transmit currency; Ledezma admitted that neither she nor Lecam nor Campero had a money transmitter's license, as required by section 560.122, Florida Statutes (1995)(Chapter 560 is the Money Transmitters' Code).[3]
Customs seized the currency and turned it over to Metro-Dade Police for forfeiture proceedings pursuant to state law. Metro-Dade Police filed a Complaint/Petition for Judgment of Forfeiture against the Claimants, alleging that the currency constituted contraband under the Florida Contraband Forfeiture Act, in that the currency represented narcotics proceeds or the proceeds of some other criminal activityi.e., money laundering. The Complaint/Petition also asserted that Ledezma was carrying currency without a license, a felony violation of section 560.125, Florida Statutes (1995).
The Claimants' primary assertions in this appeal are (1) that there was no probable cause to stop Ledezma nor to seize the currency; and (2) that there was no probable cause to support forfeiture of the currency. We disagree on both points, and will address them separately.
Probable Cause to Stop Ledezma at MIA and to Seize Currency.
We find that the stop of Ledezma at MIA was a valid, authorized Customs border search and that the seizure of the currency was a valid seizure pursuant to that search. Border searches are exceptions to the Fourth Amendment's protection against warrantless searches; no warrant is required to conduct a border search. See United States v. Ramsey, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).[4] It is permissible to conduct a border search without probable cause and even without reasonable suspicion or any individualized suspicion, so long as the search is a routine search[5] and is conducted in a "reasonable" manner. See United States v. Oriakhi, 57 F.3d 1290, 1295-96 (4th Cir.1995); United States v. Berisha, 925 F.2d 791, 793 (5th Cir.1991) (routine border searches do not require reasonable suspicion); United States v. Braks, 842 F.2d 509, 514-15 (1st Cir.1988) (not even "mere suspicion" is required). An international airport is considered the functional equivalent of an international border. See Almeida-Sanchez v. United States, 413 U.S. 266, 272-73, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); United States v. Klein, 592 F.2d 909, 911 n. 1 (5th Cir.1979) ("it is indisputable that the customs area at the Miami International Airport is ... the functional equivalent of the border"); United States v. Himmelwright, 551 F.2d 991, 993 (5th Cir.1977)(no articulable suspicion needed for customs search at Miami International Airport). Searches of departing (as well as arriving) passengers and packages at an international airport are permissible border searches. See United States v. Ezeiruaku, 936 F.2d 136, 140-41 (3d Cir.1991) (routine outbound border search falls within border search exception; no reasonable suspicion needed to justify it); Berisha, 925 F.2d at 795 (same); United States v. Benevento, 836 F.2d 60, 68 (2d Cir.1987).
*1273 One of the primary responsibilities of the United States Customs Service is to conduct border searches for the purpose of enforcing various U.S. laws, including narcotics interdiction laws, currency reporting requirements and laws prohibiting the illegal export of U.S. currency. Federal law authorizes warrantless border searches by Customs officers:
[A] Customs officer may stop and search, at the border without a search warrant, any vehicle, vessel, aircraft, or other conveyance, any envelope or other container, and any person entering or departing from the United States.
31 U.S.C. § 5317(b). As Detective Fernandez was a duly authorized Customs officer, Fernandez was authorized by 31 U.S.C. § 5317(b) to conduct the border stop and search of Ledezma in the instant case. Ledezma was certainly "at the border"at MIAwaiting to board a plane outbound from the United States to Bolivia. Probable cause was not needed to conduct the stop; in fact, no reason at all was needed. In 1986, Congress removed the "reasonable cause" requirement from 31 U.S.C. § 5317, thereby intending to authorize border searches without probable cause, to the full extent permitted by the Constitution. See Oriakhi, 57 F.3d at 1295 n. 1; Benevento, 836 F.2d at 68 n. 1. Thus, Fernandez was within his authority as a Customs officer to stop Ledezma and to question her concerning the currency.
Chapter 560 of the Florida Statutes sets forth Florida's Money Transmitters' Code. One of the purposes of this code, among others, is "[t]he deterrence of the use of money transmitters as a vehicle for money laundering." § 560.102(2)(d), Fla. Stat. (1995). To further this goal, the code requires any money transmitter operating in the state to register with the Florida Department of Banking and Finance. See § 560.122, Fla. Stat. (1995). Operating as a money transmitter without registration is a third-degree felony and also exposes the offender to an administrative fine. See § 560.125, Fla. Stat. (1995). Here, Ledezma admitted that she did not possess the required license. This was reason enough for the Customs officers to continue their questioning regarding the currency in Ledezma's possession[6] and, ultimately, to seize the currency.

Probable Cause for Forfeiture Action.
The forfeiture complaint alleged that the currency was contrabandthat it represented narcotics proceeds or proceeds from other money laundering activity. Section 932.703(1)(a) of Florida's Contraband Forfeiture Act authorizes the seizure of any "contraband article." "Contraband article" is defined as:
[a]ny ... currency ... that was used, was attempted to be used, or was intended to be used in violation of chapter 893 [Drug Abuse Prevention and Control Act], if the totality of the facts presented by the state is clearly sufficient to ... [establishes] probable cause to believe that a nexus exists between the article seized and narcotics activity, whether or not the use of the contraband article can be traced to a specific narcotics transaction.
§ 932.701(2)(a)1, Fla. Stat. (1995) (emphasis added). Another definition of "contraband article" is:
[a]ny personal property, including ... currency, which was used or was attempted to be used as an instrumentality in the commission of, or in aiding or abetting in the commission of, any felony, ... or which is acquired by proceeds obtained as a result of a violation of [this act].
§ 932.701(2)(a)5, Fla. Stat. (1995) (emphasis added). Thus, for a valid seizure of the currency under state law, there must exist probable cause to believe that the property was used in violation of the Florida Contraband Forfeiture Actthat is, used in a narcotics operation or other money laundering scheme.
In forfeiture proceedings, the initial burden is on the state to show probable *1274 cause for the forfeiture at an adversarial preliminary hearing. See § 932.703(2)(a), Fla. Stat. (1995).[7] The determination of probable cause involves "the question of whether the information relied upon by the state is adequate and sufficiently reliable to warrant the belief by a reasonable person that a violation has occurred." Medious v. Department of Highway Safety & Motor Vehicles, 534 So.2d 729, 732 (Fla. 5th DCA 1988); see also Lobo v. Metro-Dade Police Dept., 505 So.2d 621, 623 (Fla. 3d DCA 1987); United States v. One 56-Foot Motor Yacht Named Tahuna, 702 F.2d 1276, 1282 (9th Cir.1983). This belief must be more than mere suspicion, but can be created by less than prima facie proof. See Lobo, 505 So.2d at 623; United States v. $4,255,000 in U.S. Currency, 762 F.2d 895, 902 (11th Cir.1985); United States v. $364,960 in U.S. Currency, 661 F.2d 319, 323 (5th Cir.1981). Probable cause for forfeiture may be established by circumstantial evidence, see Vessel Described as One 36-Foot Mirage v. State Department of Natural Resources, 487 So.2d 1134, 1136 (Fla. 3d DCA 1986), and even by hearsay evidence, see In re Forfeiture of 1983 Wellcraft Scarab, 487 So.2d 306, 310 (Fla. 4th DCA 1986).[8] We agree with the trial court that the totality of the facts here establishes probable cause.
Initially, we consider Ledezma's admission that, although she was carrying nearly one hundred seventy-two thousand dollars, she did not possess a money transmitter's license. This is itself a felony and, certainly, Ledezma's carrying the currency constituted that felony. See § 560.125(1), (4), Fla. Stat. (1995). Further, we agree with Metro-Dade Police that carrying such a large amount of U.S. currency in a carry-on bag onto a flight about to depart the country is not typical of a legitimate business transaction, whereas it is typical of a drug or money laundering operation. See Lobo, 505 So.2d at 623 ("the large amount of money [$142,795] itself is strong evidence that the currency was intended to be furnished in return for drugs"); see also United States v. $93,685.61 in U.S. Currency, 730 F.2d 571, 572 (9th Cir.1984) (same); $364,960 in U.S. Currency, 661 F.2d at 324 (same). Ledezma's story regarding the currency was inconsistent[9] and, ultimately, not believable. There was no documentation of the alleged legitimate commercial transaction of gold for U.S. currency between Lecam and Republic Metals.[10] Ledezma did not testify at the hearing below and did not otherwise produce sufficient credible evidence to rebut Metro-Dade Police's evidence. Additionally, Customs records indicated that Ledezma had carried large sums of U.S. currency from the United States to Bolivia for Lecam on as many as thirty occasions and that Ledezma did not file the required Currency Transaction Reports for all of these occasions.[11] *1275 There was also evidence that numerous other persons had acted as couriers of U.S. currency to Bolivia for Lecam, and that Lecam's "imports" of Bolivian gold into the United States via courier were not declared to Customs, as required. Moreover, we cannot ignore the fact, as attested to by Customs officers at the hearing below, that Bolivia is well established as a major drug source country.[12] Nor can we ignore the unfortunate fact that Miami is a center for both drug smuggling and money laundering.[13]

Conclusion.
The trial court concluded, and we agree, that taking the aforementioned facts together, a reasonable person would believe that a violation of Florida's Contraband Forfeiture Act had occurredthat is, that the currency was used in (or represented proceeds of) a criminal enterprise.
The totality of the evidence here was sufficient to establish probable cause. Therefore, we affirm the trial court's order.
NOTES
[1] §§ 932.701-932.707, Fla. Stat. (1995).
[2] Fernandez is cross-designated as both a Metro-Dade Police Detective and as a United States Customs officer. Fernandez is assigned to the United States Customs Outbound Currency Task Force.
[3] Ledezma stated that she carried U.S. currency out of the country for Lecam at least twice a month.
[4] In fact, the border search exemption from warrant and probable cause requirements predates the adoption of the Fourth Amendment; the original customs statute enacted by the First Congress included this exemption. See Wayne R. LeFave, Search & SeizureA Treatise on the Fourth Amendment § 10.5(a) (3d ed.1996).
[5] Generally, border searches that have been considered to be non-routine were strip searches or body cavity searches. See United States v. Braks, 842 F.2d 509, 512-13 (1st Cir.1988).
[6] Claimants' assertion that Ledezma's Fifth Amendment rights were violated because the officers did not Mirandize her is without merit, as the officers did not arrest and had no intention of arresting Ledezma. While detained, she was not in the officers' custody; they merely seized the currency.
[7] If the state succeeds and the trial court determines that probable cause exists, then the burden shifts to the claimant to rebut the probable cause showing or, by a preponderance of the evidence, to establish that the forfeiture statute was not violated. See United States v. Motor Yacht Named Tahuna, 702 F.2d 1276, 1281 (9th Cir. 1983); Lobo v. Metro-Dade Police Dept., 505 So.2d 621, 623 (Fla. 3d DCA 1987).
[8] The standard of probable cause to support a forfeiture is less rigorous than that required to prove criminal conduct. For forfeiture, the question is not whether, in fact, the currency or property was used in (or the proceeds of) criminal activity. Rather, the question is whether there is sufficient probability to warrant a reasonable belief that that currency was connected to criminal activity. See e.g., Motor Yacht Named Tahuna, 702 F.2d at 1282; United States v. Johnson, 572 F.2d 227, 234 (9th Cir.1978); see also Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).
[9] Ledezma initially indicated to Fernandez that she had been present when the currency was delivered by Republic Metals; later she claimed that she was not present.
[10] The president of Republic Metals did testify that his company imported gold from Bolivia in exchange for cash, but he did not verify these transactions with any documentation. Further, he admitted that Customs rarely verifies what is purported to be imported into the United States.
[11] Customs files indicated that Ledezma failed to properly document courier transactions of nearly two million dollars in U.S. currency. (The trial court sustained objections to this evidence; however, we believe that it properly goes to the money laundering allegation.) The fact that, on this occasion, Ledezma possessed a Customs Form 4790 declaring the currency in her possession, does not necessarily legitimize the currency as non-contraband. In fact, there was testimony below that the Form 4790 was inaccurate and incomplete; although other testimony alleged that it was properly completed.
[12] While the fact that Ledezma was travelling to a drug source country cannot, alone, establish probable cause, see United States v. Cardona-Sandoval, 6 F.3d 15, 24 (1st Cir.1993), such information may be considered with other evidence to support probable cause. See e.g., United States v. Most, 789 F.2d 1411, 1415 (9th Cir. 1986) (Thailand); $364,960 in U.S. Currency, 661 F.2d at 323-24 (Colombia); United States v. Ambrosio, 898 F.Supp. 177, 182-83 (S.D.N.Y.1995) (Colombia).
[13] It is permissible to consider such "common knowledge" facts in a probable cause determination. See United States v. $4,255,000 in U.S. Currency, 762 F.2d 895 (11th Cir.1985)(no error in civil forfeiture action where district court took into account that Miami was drug smuggling and money laundering center).